* * * * * * * * * * *
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission upon reconsideration of the evidence, affirms in part and modifies in part, due to the additional evidence received, the Opinion and Award of the Deputy Commissioner.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties in a Pre-Trial Agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to the North Carolina Workers' Compensation Act.
2. An Employee-Employer relationship existed between the named employee and named employer.
3. Defendant is self-insured and Crawford Company is the third party administrator.
4. Plaintiff's average weekly wage was $593.20 per week, yielding a compensation rate of $395.49.
5. Plaintiff sustained an injury on or about September 13, 2000.
6. Liability was accepted by way of an Industrial Commission Form 60.
7. The Stipulation of Medical Records dated September 26, 2002 is incorporated herein by reference as if fully set forth.
 * * * * * * * * * * *
Based on the foregoing Stipulations and the evidence presented, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, Plaintiff was 42 years old and was a high school graduate. He has had some confined space training and has a Hazardous Material Training certificate and a Department of Transportation training certificate. He was able to understand and apply multiple state and federal regulations for the ten years he was employed by Defendant. Plaintiff has also taken and satisfactorily completed several continuing education classes at Beaufort County Community College, including computer-related courses.
2. Defendant employed Plaintiff from May 13, 1991 through February 19, 2001, as a Safety, Health and Environmental Supervisor at its Bridgeton, North Carolina facility.
3. Plaintiff's duties with Defendant consisted of processing the necessary paperwork for keeping Defendant in compliance with certain state and federal regulations. Plaintiff was also responsible for monitoring work-related accidents for Defendant.
4. On September 13, 2000, Plaintiff was working for Defendant at a jobsite in Hopewell, Virginia. Plaintiff alleges that while he was moving a roll of chemical cure rubber, he bent down and his right knee "popped." Plaintiff stopped working on September 14, 2000, due to his injury.
5. Plaintiff was initially treated at Beaufort County Hospital and referred to Dr. George J. Miller, an orthopedist. On September 19, 2000, Dr. Miller ordered an MRI, which showed degenerative changes in the lateral compartment, a tear of the anterior aspect of the lateral meniscus and a possible horizontal tear of the mid portion of the medial meniscus. Dr. Miller indicated that he was concerned that there was an osteoarthritic component to Plaintiff's symptoms and kept him on anti-inflammatory drugs for arthritis. Plaintiff was subsequently referred to Dr. David A. Esposito, an orthopedic surgeon.
6. Dr. Esposito initially evaluated Plaintiff for his injury on October 25, 2000. Following an examination, Dr. Esposito diagnosed Plaintiff with a new lateral meniscus tear with pre-existing arthritic changes.
7. On December 14, 2000, Dr. Esposito performed arthroscopic surgery on Plaintiff's right knee and found a small medial meniscus tear and a larger lateral meniscus tear. Plaintiff was released by Dr. Esposito to return to work on full duty with no restrictions on February 16, 2001, and assigned a ten (10%) permanent partial disability rating to the right knee.
8. While Plaintiff was out of work, Defendant discovered several omissions in Plaintiff's paperwork. Specifically, between November 1999 and September 2000, Plaintiff had failed to maintain the required paperwork for keeping Defendant's Bridgeton facility in compliance with all state and federal regulations. Plaintiff failed to attend six monthly safety meetings in 2000. Plaintiff also failed to keep up with MSDS sheets, implement Defendant's waste disposal plan, submit hazardous waste reports to the North Carolina Department of Environment and Natural Resources, document drums of waste on the weekly log sheet in the hazardous waste storage area, and do other things as set out in Defendant's Exhibit Numbers 2 and 4. Plaintiff's failure to do his job potentially exposed the Defendant to approximately $250,000.00 worth of inspection violations.
9. Plaintiff returned to work at Defendant's Bridgeton facility on February 19, 2001. At that time, Plaintiff was confronted about the omissions. He admitted that he did not do his job, but blamed it on his ongoing battle with alcohol abuse. Defendant terminated Plaintiff's employment on February 19, 2001, due to his misconduct or fault. Plaintiff did not seek other employment from February 19, 2001 through March 26, 2001.
10. Plaintiff returned to Dr. Esposito on March 26, 2001. Following examination, Dr. Esposito prescribed physical therapy, changed his earlier opinion that Plaintiff could work without restrictions and restricted Plaintiff to sedentary duty through April 16, 2001, because of continued pain in his right knee.
11. On November 19, 2001, Plaintiff underwent arthroscopic partial medial meniscectomy and unicondylar arthroplasty. As a result of his surgery, Plaintiff was unable to work from November 19, 2001 through March 27, 2002. Defendant paid Plaintiff temporary total disability compensation during this period of time pursuant to a Form 21 agreement.
12. On March 27, 2002, Dr. Esposito again released Plaintiff to return to sedentary work. Thereafter, plaintiff continued to be treated by Dr. Esposito in June, July and October 2002. Dr. Esposito still believed plaintiff was capable of sedentary work in October 2002. He testified at his first deposition on July 30, 2002, however, that Plaintiff had not reached maximum medical improvement. The Full Commission reopened the record to receive additional evidence on plaintiff's disability after March 27, 2002.
13. Dr. Barton S. Arthur, an orthopedic surgeon, reviewed Plaintiff's past medical records and performed a physical examination of Plaintiff on September 24, 2002. Dr. Arthur also indicated that Plaintiff could perform sedentary work.
14. Plaintiff was seen by Dr. Thomas P. Vail, an orthopedist on April 1, 2003. Dr. Vail testified that he reviewed Dr. Esposito's notes and took a history from Plaintiff in preparation for his evaluation. Upon examination, Dr. Vail noted that Plaintiff's knee was not particularly outstanding in terms of swelling in the knee. Dr. Vail testified that the neurological exam and alignment was normal. The x-rays showed a well-positioned partial knee replacement. He noted a notch stenosis in which there were bone spurs in the middle of the knee, which could be causing impingement and might explain Plaintiff's pain. According to Dr. Vail, notch stenosis is caused by degeneration of the cartilage or arthritic process. It is generally a condition associated with either instability or arthritis. As Plaintiff's knee was stable, he thought that it was due to arthritis or degenerative change. Dr. Vail recommended an arthroscopy to widen the notch and evaluate what else might be wrong. If the arthroscopy is not successful, he would recommend a total knee replacement. Dr. Vail was not aware of plaintiff's 1994 surgery due to fracture of the lateral tibial plateau, but agreed that fracture of the tibial plateau could cause degeneration. Dr. Vail's opinion was that plaintiff had a painful knee. He had several operations and continued to have pain. He felt there were several possibilities for the cause of the pain, including arthritis and impingement. Dr. Vail testified that the focus of his opinion, exam and recommendations was on what was present and what treatment could be rendered, not looking into past causation.
15. Dr. Vail opined that outside of activities that involved stooping, climbing, squatting, or lifting heavy objects, he could not see any reason why Plaintiff could not return to work depending on what the work duties entail. Standing and walking would not be harmful, but would be limited by pain. He felt, however, that a physician who sees a patient on a regular basis is in a better position to determine the patient's capabilities.
16. Plaintiff had ongoing problems with alcohol abuse prior to September 13, 2000. His hospitalization from March 1, 2001 until March 8, 2001 for alcohol abuse was unrelated to his September 13, 2000 injury. Plaintiff alleges he has been sober since May 2001.
17. Plaintiff has been treated for anxiety disorder and depression since at least the 1990's, but has not been restricted from working as a result of these conditions. Dr. Tara Knott had treated Plaintiff for his anxiety disorder and depression for approximately eight months prior to his injury by accident and continues to treat him. In her deposition testimony, Dr. Knott never causally related her treatment of Plaintiff to the September 2000 injury. She did indicate that Plaintiff alleged that his anxiety and depression were related to the injury, but she never indicated that it was related.
18. In December 2002, Plaintiff began counseling with Lori Melton to work through his anxiety and depression, and to give him some outlets beside medications for controlling his anxiety. During his counseling sessions with Ms. Melton, Plaintiff reported that his anxiety and depression were related to the loss of his job and self esteem. Ms. Melton reported that Plaintiff's anger increased over the year in counseling. Ms. Melton testified that Plaintiff showed up for sixty percent of his sessions and was not always compliant with her suggestions. Ms. Melton testified that Plaintiff reported he thought he was addicted to Vicodin and Valium; however, she thought Plaintiff's addiction to Vicodin and Valium should not interfere with his ability to work or at least seek employment. Ms. Melton did think that Plaintiff's abuse of alcohol might impact his ability to look for work because of hangovers and blackouts.
19. On May 28, 2004, Plaintiff returned to Dr. Miller with complaints of pain on the lateral side of his right knee. Dr. Miller diagnosed Plaintiff with osteoarthritis and determined the previous surgery looked reasonably well and was well aligned with no major technical difficulties. Dr. Miller further determined that the osteoarthritic component could have come from Plaintiff's previous knee injury.
20. Dr. Miller testified in respect to Plaintiff's need for a total knee replacement that if the hemiarthroplasty was working well and Plaintiff was addicted to pain medication, then he probably would not convert the hemiarthroplasty to a total knee replacement because the total knee replacement would probably not relieve Plaintiff's complaints of pain.
21. Plaintiff returned to Dr. Esposito on February 5, 2005, for a medical evaluation and disability rating. In his second deposition, Dr. Esposito testified that when he saw Plaintiff in February 2005, his pain complaints were pretty similar to the complaints Plaintiff previously expressed. Dr. Esposito reviewed the records from Dr. Vail and Dr. Arthur. He diagnosed Plaintiff with a fixed flexion deformity and an entrapped patella. He described fixed fexion as the inability to straighten the knee and the entrapped patella as a condition where the kneecap is not able to go where it needs to go. Dr. Esposito opined that Plaintiff's current complaints on February 5, 2005 were causally related to the condition for which he previously treated Plaintiff relating to his injury. He further opined that it is impossible to say whether the 2000 injury or the 1994 injury was responsible for plaintiff's continuing symptoms in 2005, but the September 2000 injury aggravated and exacerbated his pre-existing condition and a significant amount of the causality in 2005 was related to plaintiff's September 2000 injury. Great weight is given to Dr. Esposito's opinion that plaintiff's continuing knee pain, his other knee symptoms and his need for future medical treatment are casually related to his September 13, 2000 injury. Dr. Esposito again restricted Plaintiff to sedentary work, recommended a functional capacity examination to determine his work limitations, and assigned a fifty percent (50%) permanent partial disability rating to Plaintiff's right knee.
22. Defendant terminated Plaintiff on February 19, 2001, due to his misconduct or fault unrelated to his workers' compensation claim and for which a non-disabled employee would have been terminated. Except for the period from November 19, 2001 through March 27, 2002, Plaintiff failed to establish that his physical restrictions resulting from his injury prevented him from earning his pre-injury wages in any other employment after Defendant terminated him on February 19, 2001.
23. Plaintiff failed to establish a causal connection between his anxiety disorder and depression and his September 13, 2000 injury.
24. As a result of his knee injury, plaintiff will require future medical treatment including a possible total knee replacement. The medical treatment Plaintiff has received for his knee was reasonably required to effect a cure, provide relief or lessen his disability resulting from his September 13, 2000 work-related injury
25. The Full Commission finds that Plaintiff is capable of performing sedentary work. He has been certified and trained in various areas related to his clerical job with Defendant. Plaintiff has not made a reasonable effort to find suitable employment.
 * * * * * * * * * * *
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission concludes the following:
 CONCLUSIONS OF LAW
1. Defendant accepted liability for Plaintiff's injury arising out of and in the course of his employment on September 13, 2000. N.C. Gen. Stat. § 97-2(6).
2. Defendant terminated Plaintiff on February 19, 2001, due to his own misconduct or fault, unrelated to his workers' compensation claim and for which a non-disabled employee would have been terminated. The Full Commission reopened the record on March 31, 2004, to determine whether Plaintiff's compensable injury kept Plaintiff from working in any capacity. Plaintiff has failed to show by the greater weight of the evidence that his inability to find or perform suitable employment after his termination is due to his work-related injuries, except for the period from November 19, 2001 through March 27, 2002, for which he has been compensated. McRae v. Toastmaster, Inc.,358 N.C. 488, 597 S.E.2d 695 (2004).
3. Plaintiff has failed to prove he is currently totally disabled as a result of his compensable injuries. Russell v.Lowe's Products Distribution, 108 N.C. App. 762, 425 S.E.2d 454
(1993). Under the Russell test, Plaintiff may establish disability in one of four ways:
 1. The production of medical evidence that he is physically or mentally, as a consequence of the work related injury, incapable of work in any employment;
 2. The production of evidence that he is capable of some work, but that he has, after a reasonable effort on his part, been unsuccessful in his effort to obtain employment;
 3. The production of evidence that he is capable of some work but that it would be futile because of preexisting conditions, i.e., age, inexperience, lack of education, to seek other employment; or
 4. The production of evidence that he has obtained other employment at a wage less than that earned prior to the injury.
Id. The medical evidence reveals that Plaintiff is capable of some work, but has not made a reasonable effort to obtain employment, has not presented sufficient evidence that an employment search would be futile, and has not presented evidence that he has obtained other employment at a wage less than that earned prior to the injury. Plaintiff does not have a presumption of continuing disability since the Form 21 and Form 26 agreements paid compensation for definite periods of time. The Full Commission concludes that Plaintiff has not proven disability as a result of his work-related injury after February 19, 2001, except for the period from November 19, 2001 through March 27, 2002. N.C. Gen. Stat. § 97-29.
4. Plaintiff has reached maximum medical improvement. As a result of his compensable injury, Plaintiff sustained a fifty percent (50%) permanent partial disability to his leg and is entitled to compensation for 100 weeks at the rate of $395.49 per week. N.C. Gen. Stat. § 97-31.
5. Except for the period from November 19, 2001 through March 27, 2002, Plaintiff has failed to establish an entitlement to temporary total disability benefits after February 19, 2001. N.C. Gen. Stat. § 97-2(9).
6. Plaintiff is not entitled to receive temporary total disability benefits for the period of time from March 1, 2001 through March 8, 2001 when he was hospitalized for alcohol abuse because it was unrelated to his compensable injury.
7. Plaintiff has failed to show that his anxiety disorder and depression are causally related to his workers' compensation injury by accident on September 13, 2000.
8. Defendant is obligated to pay for all of Plaintiff's reasonably required medical treatment resulting from his knee injury of September 13, 2000, including past and future treatment and possible future knee replacement, for so long as such treatment is reasonably required to effect a cure, provide relief and/or lessen his disability. As a result of his September 13, 2000 injury to his knee, plaintiff has required continuing medical treatment. There is a substantial likelihood that plaintiff will need future medical treatment due to the September 13, 2000 injury to his knee. N.C. Gen. Stat. §§ 97-2(19); 97-25;97-25.1.
 * * * * * * * * * * *
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Since Defendant has already paid compensation for the period Plaintiff was out of work up to February 2001 and from November 19, 2001 through March 27, 2002, Plaintiff's claim for additional temporary total disability is DENIED.
2. If not already paid, Defendant shall pay to Plaintiff permanent partial disability compensation at the rate of $395.49 for 100 weeks for the fifty percent (50%) permanent partial disability to his leg.
3. Defendant shall pay all of Plaintiff's reasonably required medical treatment resulting from his knee injury of September 13, 2000, including past and future medical treatment, for so long as such treatment is reasonably required to effect a cure, provide relief and/or lessen his disability, when bills for the same shall have been submitted and approved according to Industrial Commission procedure.
4. An attorney fee of twenty-five percent of the compensation awarded Plaintiff herein is approved for Plaintiff's attorney and shall be paid as follows: twenty-five percent of the accrued compensation due Plaintiff shall be deducted and paid directly to Plaintiff's attorney. Thereafter plaintiff's attorney shall receive twenty-five percent of any unaccrued compensation due plaintiff.
5. Defendant shall pay the costs.
This the __ day of March 2006.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/____________ BUCK LATTIMORE CHAIRMAN
 S/_____________ THOMAS J. BOLCH COMMISSIONER